**IN THE UNITED STATES DISTRCT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

CHAD M. MCEVER and
SCOTT OPPENHEIMER,

                            Plaintiffs,

v.                                                      Case No.: 25-cv-508-jdp

TOWN OF SCOTT,

                            Defendant.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT**

**SUMMARY OF UNDISPUTED FACTS**

Chad McEver and Scott Oppenheimer own property abutting or benefit from the use of property abutting Birch Island Lake in Burnett County, Wisconsin [Plaintiffs' Proposed Findings of Fact, ¶¶ 1-4, 28, 50-52] (hereafter "PPFOF").  McEver, Oppenheimer, and their families, with boats designed to allow "wake surfing," have collectively engaged in that watersport on Birch Island Lake for decades, a lake that is nearly 770 acres in size. [PPOF, ¶¶ 8, 10, 29-31, 53-56]. Wake surfing is a watersport where a surfer has his or her feet on top of a wake surfing board, going at a much slower speed than water skiing, tubing, or wakeboarding – e.g., approximately 8-12 miles per hour instead of wakeboarding's 20 to 21 miles per hour – and the person wake surfing rides the wave created by the wake boat. [PPFOF ¶ 11]. Sometimes a rope is used with wake surfing [PPFOF ¶ 32], like one would with water skiing, tubing, or wakeboarding.

Unlike Oppenheimer's use of his pontoon boat to go fishing in the shallow areas of Birch Island Lake near the shoreline where he has observed his pontoon boat motor and anchor stir up and disturb the lake bottom and its vegetation where fish lay their eggs [PPFOF ¶ 23], when

1

wake surfing on Birch Island Lake, Plaintiffs are at least 500 to 700 feet from shore, in the deepest parts of the lake, away from fish spawning areas near the shore, and have not observed any disturbed lake bottom sediment stirred up from their wake surfing activity. [PPFOF ¶¶ 21-22, 24-25]. Plaintiffs further minimize any potential impacts to others, as there are very few people on Birch Island Lake when they wake surf. [PPFOF ¶¶ 26-27]. Plaintiffs exclusively use their wake boats on Birch Island Lake and do not transport them from lake to lake, effectively eliminating any prospect of transporting aquatic invasive species to or from Birch Island Lake. [PPFOF ¶¶ 42-43, 64].

Over Plaintiffs' combined decades of wake surfing on Birch Island Lake, there have been no complaints, accusations, or citations regarding their wake surfing activity on that lake, nor have there been water quality issues on Birch Island Lake. [PPFOF ¶¶12-16, 18, 44-47, 65-68, 71]. Town Board Chairperson Barton admitted there are no issues when Plaintiffs and their two boats wake surf on Birch Island Lake. [PPFOF ¶ 72]. Town Board Supervisor Vanous was "surprised" the wake surfing issue arose in the Town, since, "[Plaintiffs] had been on the lake doing it for that many years and nobody – nobody was complaining about it, and all of a sudden it's a big deal." [PPFOF ¶ 73]. Despite concerns raised individually by Barton about wake surfing on Birch Island Lake (but not concerns raised or considered by the Board as a whole) [PPFOF ¶¶ 150-153], the water quality on Birch Island Lake is "blue," "clear" and "beautiful, could not be nicer." [PPFOF ¶ 13]. Birch Island Lake has not had a notable algae issue since 2007 and phosphorus levels have remained relatively stable, which predates any use of Plaintiffs' wake boats on Birch Island Lake. [PPFOF ¶ 16].

And yet, this action arose after Barton and Vanous – two of the three supervisors on the Town Board of the Town of Scott ("Town") [PPFOF ¶¶ 6-7] enacted an ordinance ("Ordinance")

which effectively prohibits Plaintiffs' ability to wake surf on Birch Island Lake. [PPFOF ¶¶ 75-77]. Instead of attempting to restrict wake surfing with reasonable limits, the Ordinance contains overbroad draconian measures – prohibitions – in its apparent attempt to ban wake surfing on all lakes in the Town of Scott, including Birch Island Lake. [*See* Ordinance No. 2024-1, Sections 2(1) and 2(2), PPFOF ¶ 77]. The Town enacted the Ordinance after a muddled, confused process where the Board did not know who was drafting the Ordinance or the document purporting to support or justify the Ordinance, i.e., the so-called "Condition Report To Support an Ordinance Restricting Artificially Enhanced Wakes in the Waters of the Town of Scott Burnett County" (hereafter "Condition Report") [PPFOF ¶¶ 81-103] which had a fleeting reference to Birch Island Lake. [PPFOF ¶ 118, at Town of Scott RFP 000394]. The Town Board and Town Clerk did not know who was drafting subsequent revisions to the Ordinance and Condition Report [PPFOF ¶¶ 107-112], with such revised Ordinance and Condition Reports constituting "significant" changes [PPFOF ¶ 111] that were resent to the WDNR without Town Board approval. [PPFOF ¶ 113-117]. At a September 23, 2024 public hearing regarding the Ordinance, the Town Chairman stated, he was "not in favor of an oversweeping law that says we can't do this here or there. I mean there's got to be a compromise someplace" and that "we'll have to continue to talk about this." [PPFOF ¶¶ 127-128]. Between the September 23 public hearing and November 11, 2024, the Board did not discuss the Ordinance or Condition Report during its meetings. [PPFOF ¶ 129].

The Ordinance was ultimately passed by Barton and Vanous without any discussion at its November 11, 2024 meeting. [PPFOF ¶¶ 78-79]. The Town enacted the Ordinance without having publicly discussed, reviewed, or approved the Condition Report that was sent to the WDNR attempting to justify the Ordinance's prohibitions. [PPFOF ¶¶ 97-99, 114-115]. The

3

Town enacted the Ordinance without making revisions to issues noted by the Wisconsin Department of Natural Resources related to "subjective" and "difficult to enforce" terms. [PPFOF ¶ 104 at RFP 002166; ¶ 119 at RFP 000119; ¶¶ 120-121].

Despite the Ordinance's passage, and signage being placed at the Birch Island Lake boat landing to publicize the Ordinance [PPFOF ¶ 80], both McEver and Oppenheimer wake surfed or operated their boats for wake surfing on multiple occasions in 2025 on Birch Island Lake. [PPFOF ¶¶ 48, 69]. They intend to continue doing so in 2026. [PPFOF ¶¶ 49, 70].

## SUMMARY JUDGMENT STANDARD

Granting summary judgment is proper "when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021). "A dispute of fact is 'genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (citations omitted). Although facts are to be viewed and reasonable inferences drawn in a manner most favorable to the non-moving party, that party must come forward with "…specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

## ARGUMENT

The Ordinance exceeds the Town's authority under Wisconsin law and violated Plaintiffs' constitutional rights to due process. Summary judgment in favor of Plaintiffs is proper. If granted in favor of the Plaintiffs on any of the following bases, invalidation of the Ordinance results.

## I.    TOWN EXCEEDED ITS STATUTORY AUTHORITY TO ENACT ORDINANCE WHEN TOWN FAILED TO COMPLY WITH ALL REQUIREMENTS UNDER WIS. STAT. § 30.77(3)(CM)

Towns are municipal entities with limited authority and the Town's Ordinance exceeds its authority under Wis. Stat. § 30.77(3). "A town has only such powers as are conferred on it by statute or are necessarily implied therefrom." *Pugnier v. Ramharter*, 275 Wis. 70, 73, 81 N.W.2d 38, 40 (1957). A Town acting outside its statutory authority is *ultra vires* and unlawful. *Id.*

In this instance, the legislature granted the Town limited authority to enact ordinances regulating boating. *First*, except as authorized under Wis. Stat. § 30.77(2) or (3), the Town is prohibited from enacting an ordinance "that in *any manner* excludes any boat *from the free use of the waters* of this state or that pertains to the *use, operation or equipment of boats* or which governs any activity regulated by ss. 30.50 to 30.71." Wis. Stat. § 30.77(1)(b) (emphasis added). Because Sections 2(1) and 2(2) of the Ordinance contains prohibitions related to Plaintiffs' use of their respective boats [PPFOF ¶ 77], the Ordinance excludes their boats "from the free use of the waters of this state" and also "pertains to the use, operation or equipment of boats." Wis. Stat. § 30.77(1)(b). If the Town fails to follow the requirements in the statutory scheme to enact the Ordinance under Wis. Stat. § 30.77(3), the Ordinance fails, as it violates Wis. Stat. § 30.77(1)(b)'s prohibitions and is *ultra vires*.

*Second*, as part of the statutory scheme to enact the Ordinance within that limited authority under Wis. Stat. § 30.77(3)(a), in enacting an ordinance which relates to regulating boats, equipment, use, or operation of the same, the Town:

> [S]hall take into account factors that include *all of the following:*
>
> 1. The type, size, shape and depth *of the body of water* and any features of special environmental significance that the body of water has.

5

2. The amount, type and speed of boating traffic *on the body of water* and boating safety and congestion.

3. The degree to which the boating traffic *on the body of water* affects other recreational uses and the public's health, safety and welfare, including the public's interest in preserving the state's natural resources.

Wis. Stat. § 30.77(3)(cm)1.-3. (emphasis added). Each factor must be taken into account, not on a generalized basis, but as applied specifically to "the body of water" that the Town seeks to regulate through its Ordinance. Wis. Stat. § 30.77(3)(cm)1.-3.

Accounting for those factors on a case-by-case, lake-by-lake basis is not optional. It is a requirement. "The general rule is that the word 'shall' is presumed mandatory when it appears in a statute." *State v. Cox*, 2018 WI 67, ¶ 11, 382 Wis. 2d 338, 913 N.W.2d 780 (quotations and citations omitted). There is no language such as, "may" take into account, "shall, to the extent practicable," or other qualifier for the Town to avoid some or all of the factors which it must take into account when enacting an Ordinance under Wis. Stat. § 30.77(3)(a). By its plain language, the use of "shall" in this instance is mandatory and taking into account all of those factors is part of the requirements to enact an Ordinance under Wis. Stat. § 30.77(3).

By requiring Towns to take those factors into account, the legislature has shown its intent that these factors are not a nicety to be glossed over or ignored, but critical in the analysis of whether that restriction is warranted and consistent with the case-by-case, lake-by-lake approach required under Wisconsin law. Why are these factors important? If the Town is going to enact a restriction (or in this case a prohibition) on a boating activity under Wis. Stat. § 30.77(3)(cr) (discussed *infra*, Section II), such restriction (or prohibition here) directly clashes with the long-standing right to engage in recreation on Wisconsin lakes. Such rights to recreation are sacrosanct, enshrined in Wisconsin's Constitution under its Public Trust Doctrine and through Wisconsin Statutes and the common law, where riparian owners have a right to reasonable

recreation (discussed *infra*, Section IV). In order for the Ordinance to strike the proper balance to ensure lake uses are "balanced and accommodated on a case by case basis," at minimum, taking those factors into account is required in order to guide the Town's decision-making. *State v. Vill. of Lake Delton*, 93 Wis. 2d 78, 96, 286 N.W.2d 622 (Ct. App. 1979). Taking into account such factors also inherently helps guide the Town to "confine[] its remedy to the precise outlines of the need addressed" so an overreach and unlawful "effect on the rights of [lake users] is negligible." *Lake Delton*, 93 Wis. 2d at 105-06.

As set forth below, the Town Board as a whole, in enacting the Ordinance, failed to take into account all of those required factors all in Wis. Stat. § 30.77(3)(cm)1.-3. for Birch Island Lake, the particular "body of water" at issue for Plaintiffs.[1] Accordingly, the Town did not enact the Ordinance pursuant to the limited authority given to the Town under Wis. Stat. §§ 30.77(1)(b) and 30.77(3)(cm). The Town acted outside the required statutory scheme to enact the Ordinance and the Ordinance is *ultra vires* and unlawful.

### A.  Town Did Not Take Into Account the Factor under Wis. Stat. § 30.77(3)(cm)2

Both Barton and Vanous – who constituted the majority of the three (3)-person Town Board of Supervisors who enacted the Ordinance [PPFOF ¶¶ 75-76] – could not point anywhere in the record where or locate any document, or other material or evidence which demonstrated the Town Board as a whole took into account "the amount, type and speed of boating traffic on the body of water and boating safety and congestion" for Birch Island Lake, as required by Wis. Stat. § 30.77(3)(cm)2 [*see* PPFOF ¶¶ 130-131]. The only place in the Town's final Condition Report that references Birch Island Lake simply references its size in acres and its depth in an

---

[1] Because Plaintiffs own property and/or recreate on Birch Island Lake, for the purposes of summary judgment, Plaintiffs limit the challenge to the Town's compliance with those statutorily-required factors as applied to Birch Island Lake, i.e., "the body of water" at issue for Plaintiffs. Wis. Stat. § 30.77(3)(cm)1.-3.

Appendix. [PPFOF ¶ 132, at RFP 000394]. The Condition Report is completely devoid of any reference to the "amount, type and speed of boating traffic on [Birch Island Lake] and boating safety and congestion." Wis. Stat. § 30.77(3)(cm)1.-3. [PPFOF ¶¶ 139, 141]. There were no traffic reports for Birch Island Lake indicating how busy the lake is, which would potentially serve as a basis to justify the Ordinance's prohibitions based on the amount, type, and speed of boating traffic or the safety or congestion issues on Birch Island Lake if Plaintiffs' two wake boats were allowed to continue wake surfing. [PPFOF ¶ 140].[2]

The Town Board as a whole had no discussion of traffic reports or the amount of boating activity or boating safety and congestion on Birch Island Lake. [PPFOF ¶¶ 140, 142]. Vanous conducted "zero" independent research, did not review the Condition Report, and he "pretty much didn't care." [PPFOF ¶¶ 97-98; 149]. Barton defended the lack of Board review of traffic studies or traffic issues on Birch Island Lake by asserting he conducted his own "private" research, but he did not, share results of his private research, anecdotal observations, or reasoning with anyone else on the Town Board for the Board as a whole to take into account when enacting the Ordinance. [PPFOF ¶¶ 150-153]. The Board did not consider any information privately assembled by Barton related to Birch Island Lake and such information was not provided in any Condition Report. [PPFOF at ¶¶ 151-153]. In the Condition Report, there was a now-five-year-old anecdotal story about a wake surfing incident on a different lake that was not Birch Island Lake, and that story is not directed at any alleged issue specifically pertaining to

---

[2] The lack of traffic studies or the Town Board wanting to look at traffic issues specific to Birch Island Lake is no surprise, particularly as the Board had received no complaints related to Birch Island Lake and that would not have supported the Town's action to prohibit wake surfing on Birch Island Lake. [PPFOF ¶¶ 71-73]. Vanous was surprised because he had not received any complaints regarding wake surfing on Birch Island Lake. [PPFOF ¶ 73]. Barton claimed this was a brand new issue to him, so he had not heard complaints either, especially as it pertained to Birch Island Lake. [PPFOF ¶ 71, Dkt. 42 at 82:19-25]. Neither of the Plaintiffs had been accused of or cited for engaging in any unsafe boating laws when wake surfing on Birch Island Lake, nor did they ever hear any complaints about their activities on Birch Island Lake. [PPFOF ¶¶ 44-47, 65-68].

Birch Island Lake, i.e., the "body of water" subject to the Ordinance's prohibitions. [PPFOF ¶ 118 at RFP 000395].[3]

The failure of the entire Board to take into account "the amount, type and speed of boating traffic on the body of water and boating safety and congestion" for Birch Island Lake is fatal to the Ordinance as applied to Birch Island Lake. Wis. Stat. § 30.77(3)(cm)2. The Town failed to meet the mandatory requirements of Wis. Stat. § 30.77 and summary judgment in favor of Plaintiffs is proper.

**B. Town Did Not Take Into Account the Factor under Wis. Stat. § 30.77(3)(cm)3**

As was the case with to subs. (cm)2., Barton and Vanous could not point anywhere in the record where or locate, any document, or other material or evidence which demonstrated the Town Board as a whole took into account "[t]he degree to which the boating traffic on the body of water affects other recreational uses and the public's health, safety and welfare, including the public's interest in preserving the state's natural resources" for Birch Island Lake, as required by Wis. Stat. § 30.77(3)(cm)3. The Condition Report completely lacks the information in this factor as it pertains to Birch Island Lake. [PPFOF ¶¶ 143, 145, 147]. No anecdotes in the Condition Report refer to Birch Island Lake. [PPFOF ¶ 118]. There are no traffic reports or assessments of Birch Island Lake's traffic. [PPFOF ¶ 149]. If Barton privately researched this information, he failed to share any of that personal research to be considered and taken into account by the Town Board as a whole in making its decision. [PPFOF ¶¶ 150-153]. The failure of the entire Town Board to take into account that the factor under sub. 3 [PPFOF ¶¶ 144, 146, 148] is fatal to the

---

[3] If that story in Appendix 3 of the Condition Report is taken as the gospel truth, setting aside it is one story in decades of wake surfing in the Town, a complete prohibition through an Ordinance, existing state law already makes such negligent, dangerous boat operation a citable, punishable offense in which the harmed party can obtain damages from the negligent boat operation. *See* Wis. Stat. §§ 30.68(2), (4)(a), and (4)(b).

Ordinance as applied to Birch Island Lake. The Ordinance is void for failure to follow the mandatory requirement and summary judgment in favor of Plaintiffs is proper.

### C. Town Did Not Take Into Account all Components of the Factor under Wis. Stat. § 30.77(3)(cm)1.

The Town failed to take into account all required components in subs. (cm)1. There is at least some reference to the "size" and "depth" of Birch Island Lake in the Condition Report. [PPFOF at ¶¶ 133-134]. Accordingly, Plaintiffs anticipate the Town will cite to the so-called Condition Report in an attempt to claim the Town satisfied the required factor to consider the "type, size, shape and depth of the body of water and any features of environmental significance that the body of water has," but the Condition Report failed to meet the requirements for Wis. Stat. § 30.77(3)(cm)1.

*First,* there is no support in the record that the Town Board drafted, reviewed, discussed, considered, and approved the Condition Report with its informational items related to Birch Island Lake. [PPFOF ¶¶ 95-99, 114-115]. How do they take into account that information from the Condition Report if they did not draft, review, discuss, or approve the Condition Report?

*Second,* even if the Town Board is inferred to have reviewed the Condition Report, the Condition Report fails to assess all of the required components within Wis. Stat. § 30.77(3)(cm)1. While the Condition Report cites Birch Island Lake's size of 768 acres and its depth, listing it as having a maximum depth of 13 feet [PPFOF ¶ 9], the Condition Report fails to consider the "type" and "shape" of Birch Island Lake, as required by Wis. Stat. § 30.77(3)(cm)1. [PPFOF ¶¶ 135, 138]. The Condition Report's generalized reference to "contoured bowl shaped lakes" in the Town is not specific to Birch Island Lake (nor is there any reason offered in the Condition Report what a lake being "bowl-shaped" would have to do with justifying complete prohibitions enacted under the Ordinance). [PPFOF ¶ 118 at RFP 000394].  There is no reference

10

in the Condition Report or elsewhere in the record which shows the Town Board as a whole considered the lake "type" or its "shape." [PPFOF ¶¶ 136-137].

**II.    ORDINANCE'S COMPLETE PROHIBITIONS EXCEED TOWN'S LIMITED STATUTORY AUTHORITY TO ENACT RESTRICTIONS UNDER WIS. STAT. § 30.77(3)(CR)1.-4.**

The Ordinance's prohibitions exceed the Town's statutory authority to "restrict" boating activities. The Wisconsin legislature granted the Town limited authority to enact ordinances regulating boating. *See discussion supra,* Section I; Wis. Stat. § 30.77(1)(b). When the Town's Ordinance does not comply with the limited statutory authority in Wis. Stat. § 30.77(3), the Town is acting outside its authority and its Ordinance is *ultra vires* and unlawful. *See* Wis. Stat. § 30.77(1)(b); *Pugnier*, 275 Wis. at 73.

The Town presumably purported to act within its limited authority under Wis. Stat. § 30.77(3)(cr) to enact "restrictions" on certain types of boating activities. There lies the problem. The plain language of Wis. Stat. § 30.77(3)(cr) authorizes "restrictions" but not "prohibitions" or "complete prohibitions," as Section 2 of the Ordinance purports to do. [PPFOF ¶ 122, Second Helquist Declaration, ¶ 5 at RFP 000031]. Section 30.77(3)(cr), Wis. Stats., provides:

> **(cr)** The types of ordinances that may be enacted under par. (a), (ab), (am), or (b) include the following:
> **1.** *Restrictions* on speed.
> **2.** *Restrictions* on certain types of boating activities on all, or in specified parts, of the lake, river or stream.
> **3.** *Restrictions* on certain types of boating activities during specified hours of the day or specified days of the week.
> **4.** *Restrictions* on the operation of a motorboat towing a person on water skis without an observer, as provided in s. 30.69(1)(a)1.

The Town's Ordinance exceeds its statutory authority when it goes further than engaging in statutorily-authorized "restrictions" by creating outright prohibitions, not only as to Birch Island Lake, but all lakes in the Town impacted by the Ordinance.[4]

### A. Plain and Ordinary Meaning Does Not Support Authority of Town's Prohibitions When Only "Restrictions" are Authorized by Wis. Stat. § 30.77(3)(cr)1.-4.

The plain and ordinary meaning of "restrictions" in Wis. Stat. § 30.77 do not authorize the Ordinance's prohibitions. The statutory provisions in Wis. Stat. § 30.77(3)(cr) do not define "restrictions" nor is the term "prohibit" defined by the Ordinance. [PPFOF ¶ 122, Second Helquist Declaration, ¶ 5 at RFP 000031]. With all questions of statutory interpretation, the Court "start[s] with the text of the statute to ascertain its plain meaning." *United States v. Melvin*, 948 F.3d 848, 851 (7th Cir. 2020) (quotations and citations excluded) (hereafter *Melvin*). The Court looks to the language and design of the statute as a whole and "unless words are otherwise defined, they 'will be interpreted taking their ordinary, contemporary, common meaning.'" *Id.* at 852. Words are to be construed as to their common and approved usage. *See* Wis. Stat. § 990.01(1). "If the statutory language's plain meaning is unambiguous, our inquiry ends there." *Melvin*, 948 F.3d at 852.

---

[4] If the Ordinance is held to authorize a complete prohibition on a particular boating activity or use of equipment as opposed to a restriction under Wis. Stat. § 30.77(3)(cr), there are broader practical implications. That is, moving forward, what statutory authority stops a three-person Town Board from outright prohibiting the use of fishing equipment such as anchors, trolling motors, outboard or inboard motors, rods and reels, sonar, and live wells if the Town attempts to justify such prohibitions by arguing anchors and motors in shallow water tear up and disturb the lake bottom, vegetation, and spawning areas [*see* PPFOF ¶ 23], that rods, reels, and sonar take fish from and disturb the lake's ecosystem, that residual water in live wells and motors cannot be completely emptied and transfer aquatic invasive species, and that too many fishing boats speeding from spot to spot on a lake disturb the enjoyment of or create safety issues for other lake users? If the Ordinance is authorized under Wis. Stat. § 30.77(3)(cr), other recreational interests – even seemingly innocuous ones like fishing – are vulnerable to municipal prohibitions. Any action as drastic as a prohibition must be expressly authorized by state statutes, not through the Town's sleight of hand attempting to substitute "restriction" for "prohibition" in Wis. Stat. § 30.77(3)(cr).

By their plain meanings, a restriction and a prohibition are materially different terms authorizing distinctly different actions. A restriction allows, but with limits. A prohibition forbids. "Restrict" is "to *confine* within bounds," to "limit" or "to place under restriction as to use." THE MERRIAM-WEBSTER DICTIONARY 430 (2019) (10th printing). A prohibition goes further, and is more punishing in its scope than a restriction by attempting to completely forbid or ban an activity. "Prohibit" is "to *forbid* by authority," or "to *prevent* from doing something." *Id.* at 399 (emphasis added).

As such, Section 2 of the Town's Ordinance, by enacting prohibitions, instead of restrictions which allow the activity in some limited capacity, exceeds its limited statutory authority in Wis. Stat. § 30.77(3)(cr)1.-4. *See* Wis. Stat. § 30.77(1)(b) (unless authorized under Wis. Stat. § 30.77(3), the Town is prohibited from enacting an ordinance which "excludes any boat from the free use of the waters of this state or that pertains to the use, operation or equipment of boats"). Here, if the Town had otherwise properly enacted restrictions within its Ordinance those activities would still be allowed, but those activities would be subject to certain rules that confine or limit the uninhibited exercise of that boating activity, i.e., a restriction. The prohibitions, as contained in Section 2 of the Ordinance, go further by seeking to completely forbid and prevent any of that type of a particular boating activity. The activities in Section 2 of the Ordinance are not confined within certain parameters as a restriction would be. They are outright banned.

Based on the plain language of Wis. Stat. § 30.77(3)(cr)1.-4. authorizing limited restrictions, and contrasted with the Ordinance's complete prohibitions, such outright prohibitions as opposed to lesser restrictions, are *ultra vires* and unlawful. *See Pugnier*, 275 Wis.

13

at 73. The Court need go no further to declare Section 2(1) and Section 2(2) of the Ordinance illegal. Summary judgment in favor of the Plaintiffs is proper.

### B. Surrounding Statutory Language Distinguishes Between "Restrictions" and "Prohibitions"

If there is still ambiguity regarding the Town's ability to enact prohibitions versus restrictions, the context of the statute, by examining the terms surrounding Wis. Stat. § 30.77(3)(cr) assist the Court in its statutory interpretation, which shows the legislature intended to differentiate between a prohibition and a restriction. "When the legislature uses different terms in a statute, the terms are presumed to have distinct meanings." *Int. of A.L.*, 2019 WI 20, ¶ 17, 385 Wis. 2d 612, 622, 923 N.W.2d 827, 832. Where a statute uses one term in one place and a different term in another, this gives rise to the presumption that the two terms are materially different in their meanings. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (applied to contracts). Aiding that interpretation, the Court also looks to the language surrounding the closely related statutes. "Statutes are closely related when they are in the same chapter, reference one another, or use similar terms." *State v. Reyes Fuerte*, 2017 WI 104, ¶ 27, 378 Wis. 2d 504, 904 N.W.2d 773. "When the legislature uses different terms in a statute—particularly in the same section—we presume it intended the terms to have distinct meanings." *Milwaukee Dist. Council 48 v. Milwaukee Cnty.*, 2019 WI 24, ¶ 29, 385 Wis. 2d 748, 924 N.W.2d 153 (quotations and citations omitted).

In stark contrast to the term "restriction" in Wis. Stat. § 30.77(3)(cr)1-4., other provisions in Wis. Stat. § 30.77 and its closely surrounding sections in Chapter 30 related to boating and other water-related activities use the term "prohibition" (or "prohibit" or "prohibited"), showing when the legislature intended for an activity or use to be forbidden. Had the legislature intended to authorize the Town to completely prohibit a water-related activity on lakes, instead of restrict

it, the legislature certainly could have done so and the following examples demonstrate that the legislature knew how to do so if the intent in subs. (cr)1.-4. was to authorize "prohibitions":

- Within the same statutory section, in Wis. Stat. § 30.77(1), "Local regulation of boating. (1) LOCAL REGULATION *PROHIBITED*; EXCEPTIONS" the legislature expressly forbids towns from enacting certain ordinances that do not comply with the requirements in the statutory scheme of § 30.77. (emphasis added).

- In Wis. Stat. § 30.77(3)(ab), the town has express authority to not just restrict, but to "enact an ordinance to *prohibit* a person operating a motorboat towing a person on water skis, aquaplane, or similar device without an observer" if certain conditions apply. (emphasis added).

- In Wis. Stat. § 30.78(1)(b), a town may enact an ordinance to limit the areas that can be used for landing or takeoff or it may "*prohibit* the use of the waters altogether" for seaplanes (emphasis added). Section 30.78(1)(b), Wis. Stat., was in existence when Wis. Stat. § 30.77(3)(cr) became law,[5] and if "restrict" really meant the Town could "prohibit" a boating activity in its entirety on all waters, the legislature would not have distinguished between restrict and prohibit, and would have expressly stated that boating activities can be "prohibited on waters altogether," just as towns could "prohibit the use of the waters altogether" for seaplanes. The Court "must assume that the legislature knew the law in effect at the time of its actions" and the legislature specifically chose a different term – restrict, not prohibit, in Wis. Stat. § 30.77(3)(cr). *State v. Olson*, 175 Wis. 2d 628, 641, 498 N.W.2d 661, 666, (1993).

---

[5] The "restrictions" in Wis. Stat. § 30.77(3)(cr)1.-3. were created through 1995 Wisconsin Act 152 (*available at* https://docs.legis.wisconsin.gov/1995/related/acts/152.pdf (last accessed April 19, 2026). The version of Wis. Stat. § 30.77(3) (1993-94) and Wis. Stat. § 30.78(1)(b) (1993-94) in existence prior to passage of 1995 Wisconsin 152 is available at https://docs.legis.wisconsin.gov/1993/statutes/statutes/30.pdf (last accessed April 19, 2026).

- In Wis. Stat. § 30.635, there is an express "[m]otorboat prohibition" that provides instances in which motorboats cannot be "operated in excess of slow-no-wake speed" on lakes that are 50 acres or less. When the legislature expressly authorized a prohibition on wake-related activities, the legislature directed such prohibitions on small lakes that are less than 50 acres. No such prohibition exists in the statute for large lakes, like the nearly 770 acres that Birch Island Lake is. [PPFOF ¶ 8].

- In Wis. Stat. § 30.68(4), under "prohibited operation" of a boat, no person can operate a motorboat to create a hazardous wake or wash or cause damage to another person or property. When the legislature sought to authorize a prohibition on hazardous wakes, it did so clearly, through an already-existing, otherwise enforceable statute. The Town is authorized to enact Wis. Stat. § 30.68(4) as a standalone Town Ordinance if it seeks to prohibit "hazardous" wakes. *See* Wis. Stat. § 30.77(2) ("Any municipality may enact ordinances which are in strict conformity with ss. 30.50 to 30.71 or rules of the department promulgated under those sections.")

The above list is not exhaustive. However, it still demonstrates that the legislature has made a distinction between a "restriction" and a "prohibition." *See also* Wis. Stat § 30.61(1) (addresses "prohibited lights" on boats); Wis. Stat. § 30.68 (titled "[p]rohibited operation" and lists types of boat usage and operation that are banned); Wis. Stat. § 30.74(2)(a) (WDNR may not "prohibit" placement of regulatory markers or navigation aid if it complies with marking system and ordinance).[6]

---

[6]A recently proposed legislative amendment to Wis. Stat. § 30.77 (Senate Bill 1024) (hereafter "SB 1024") reinforces the interpretation that prohibitions are not authorized under Wis. Stat. § 30.77(3)(cr)1.-4. (SB 1024 *available at* https://docs.legis.wisconsin.gov/2025/related/proposals/sb1024.pdf) (last accessed April 7, 2026). Legislators in their reading of Wis. Stat. § 30.77(3)(cr)1.-4. apparently recognized the present lack of authority of towns to enact a complete prohibition versus a restriction.

The legislature is presumed to know what the law is, the surrounding provisions, and draft and enact legislation accordingly. "The legislature is presumed to 'carefully and precisely' choose statutory language to express a desired meaning." *Southport Commons, LLC v. DOT*, 2021 WI 52, ¶32, 397 Wis. 2d 362, 960 N.W.2d 17 (citation omitted). Here, the legislature chose to differentiate between "restriction" in Wis. Stat. § 30.77(3)(cr)1.-4. and "prohibition" elsewhere, such as authorizing towns in Wis. Stat. § 30.78(1)(b) to "prohibit the use of the waters altogether" for seaplanes. This context shows the legislature knew how to use the words "prohibit" but did not do so in Wis. Stat. § 30.77(3)(cr)1-4. Both prohibit and restrict must mean different things. *See Clean Wisconsin, Inc. v. Wisconsin Dep't of Nat. Res.,* 2021 WI 71, ¶ 25, 398 Wis. 2d 386, N.W.2d 346 ("This context shows us that the legislature knew how to use the word "specific," but did not do so in § 227.10(2m). As a result, we must presume the two words, explicit and specific, mean different things.")

With the legislature making the material distinction between "restriction" and "prohibition," rewriting Wis. Stat. § 30.77(3)(cr)1.-4. to replace "restriction" with "prohibition" is improper. If the Town wants the authority in the statutes to completely prohibit, rather than restrict a boating activity, it needs the legislature to change the law to authorize "prohibitions," as was already attempted in this past legislative session with SB 1024 (but which the legislature

---

Section 3 of SB 1024 sought to add a new subsection to sub. (cr)1-4., by creating Wis. Stat. § 30.77(3)(cr)5., which reads:

> 30.77 (3) (cr) 5. Restrictions on wake-enhanced boating, *including prohibitions* on wake enhanced boating in specified areas; minimum distances from shore, structures, or other boats; minimum water depths; time-of-day restrictions; and *complete prohibitions* on certain or all bodies of water.

(emphasis added). A proposed expansion of Town authority which distinguishes between "restrictions" and "prohibitions" and to allow "complete prohibitions" is not needed if the Town had that prohibition authority under Wis. Stat. § 30.77(3)(cr)1.-4. to enact ordinances which "restrict" certain boating activities.

failed to accomplish). "It is not the function of this court to make policy decisions or to rewrite statutes to accomplish a result that a party urges upon us." *State ex rel. Anderson v. Town of Newbold*, 2019 WI App 59, ¶ 21, 389 Wis. 2d 309, 935 N.W.2d 856, 861, *aff'd*, 2021 WI 6, 395 Wis. 2d 351, 954 N.W.2d 323 (citing *Milwaukee Journal Sentinel v. City of Milwaukee*, 2012 WI 65, ¶¶36-37, 341 Wis. 2d 607, 815 N.W.2d 367); *see Talevski by next friend Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 721 (7th Cir. 2021), *aff'd sub nom. Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 143 S. Ct. 1444, 216 L. Ed. 2d 183 (2023) (court's role is not to "rewrite the statute"). If the legislature meant something other than what it said – authorizing "restrictions" instead of the Town's desired language of "prohibitions" to address wake surfing – any desired "[m]odifications of the statute if it works badly or in unexpected and undesirable ways must be obtained through legislative, not judicial action." *State ex rel. Badtke v. Sch. Bd. of Joint Common Sch. Dist. No. 1, City of Ripon*, 1 Wis. 2d 208, 213, 83 N.W.2d 724, 727 (1957).

In contrast to the clear choice to authorize prohibitions elsewhere throughout the closely related boating and water activity-related statutes in Chapter 30, Wis. Stats., the legislature limited the Town's authority to enact restrictions on boating activities under Wis. Stat. § 30.77(3)(cr)1.-4, not outright prohibitions as the Ordinance does. The Ordinance is ultra vires and unlawful. Summary judgment in favor of the Plaintiffs is proper.

### C. Legislative History Supports the Interpretation that a "Restriction" does Not Authorize "Prohibitions"

If ambiguity still remains in the use of the term "restriction" in Wis. Stat. § 30.77(3)(cr)1.-4., legislative history supports the reading that a restriction is not intended to be so extreme as to authorize complete prohibitions.  The "restriction" language in par. (3)(cr) was adopted in 1996. 1995 Wisconsin Act 152, 1995-96 Session, (Mar. 6, 1996) (*available at*

https://docs.legis.wisconsin.gov/1995/related/acts/152.pdf) (last accessed April 19, 2026). However, par. (3)(a) pre-dated that section, stating – prior to 1996 – that "[a]ny town, village or city may, in the interest of public health, safety or welfare, enact ordinances applicable on any waters of this state within its jurisdiction…" Wis. Stat. § 30.77(3)(a) (1993-94). The restrictions within par. (3)(cr) were created to modify par. (3)(a), describing the boating restrictions as "types of ordinances that may be enacted under par. (a), (am) or (b)…" 1995 Wisconsin Act 152, 1995-96 Session.

Adding language that specifically modifies and narrows the broad discretion delegated to municipalities under par. (3)(a) indicates that the legislature intended to confine the power of municipalities to restrictions, not prohibitions, on types of boating activities, especially when the legislature had already chosen to authorize prohibitions elsewhere in the statute. *See* Wis. Stat. § 30.78(1)(b), *discussion supra*, Section II.B.

### D. Wis. Stat. § 30.77(3)(cr)2 Does not Authorize Prohibitions on All of Birch Island Lake

Plaintiffs anticipate the Town will argue it is allowed to enact its prohibitions on the entirety of Birch Island Lake and other lakes within the Town under Wis. Stat. § 30.77(3)(cr)2.'s provisions that authorize "restrictions on certain types of boating activities on all, or in specified parts, of the lake, river or stream." Such an interpretation reads the statute too broadly.

*First*, when the legislature authorized a town to enact a "prohibition" to exist on all parts of a lake, the legislature specifically gave that authority in very limited circumstances as applied to seaplanes, when a town can "prohibit the use of the waters altogether" for that particular use. Wis. Stat. § 30.78(1)(b). That type of broader language expressly authorizing a town to "prohibit the use of the waters altogether" for seaplanes does not exist in Wis. Stat. § 30.77(3)(cr)2. The legislature "'carefully and precisely' choose statutory language to express a desired meaning,"

*Southport Commons, LLC*, 2021 WI 52, ¶32, chose to use "restrict" instead of "prohibit," and that difference is presumed to be deliberately chosen by the legislature. *See Int. of A.L.*, 2019 WI 20, ¶ 17 ("When the legislature uses different terms in a statute, the terms are presumed to have distinct meanings.")

*Second*, interpreting "restrictions" on "all. . .of the lake" to allow a complete "prohibition" on "all . . . of the lake" improperly inserts language into the statute which the legislature did not include. As evidenced by the myriad of times the legislature chose "prohibit" elsewhere throughout Chapter 30, especially as it relates to prohibiting seaplanes on all parts of a lake, the legislature made a choice between two terms and chose "restrict" instead of prohibit in Wis. Stat. § 30.77(3)(cr)2. *See Southport Commons, LLC*, 2021 WI 52, ¶ 32. It is improper to substitute the terms the legislature enacted and rewrite the statute by substituting restrict for prohibit. *See Town of Newbold*, 2019 WI App 59, ¶ 21 (not function of the court to rewrite statutes). "Rewriting is work for the legislature…." *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 333 (7th Cir. 1985), *aff'd* 475 U.S. 1001, 106 S. Ct. 1172, 89 L. Ed. 2d 291 (1986).

*Third,* in light of the legislature's decision to authorize "restrictions" on "all . . . parts of the lake," interpreting "restriction" as distinct from a "prohibition" does not render the additional language as surplusage, nor does it result in an absurd or unreasonable reading of subs. (cr)2. A reasonable reading provides a simple case of what can be authorized as a legal restriction under the existing language in that subsection. Instead of a prohibition, subs. (cr)2. may instead authorize an ordinance where a restriction is enacted – e.g., extended setbacks for wake surfing from the shoreline – which exist around "all of the lake." For example, if Birch Island Lake enacted a 200-foot setback from the shoreline for wake surfing around "all . . . of the lake", that restriction, as opposed to a lake-wide complete prohibition on wake surfing, may be legal if

20

properly enacted and justified by the Town through the other requirements of Wis. Stat. § 30.77. This interpretation of subs. (cr)2. and its application is not novel. Multiple municipalities across Wisconsin have enacted extended setback ordinances on "all . . . of the lake" or have established broader slow-no-wake 200-foot setbacks around all of a lake without issue.[7]

Further still, Plaintiffs' interpretation of subsection (cr)2. can also be read in harmony with subs. (cr)3. as it relates to "restrictions on certain types of boating activities during specified hours of the day or specified days of the week" as it pertains to "slow, no-wake" times on lakes. Many municipalities across Wisconsin have set aside times for "slow no wake" operations that apply to all of a lake.[8] Those restrictions can apply to "all of the lake" provided that they remain restrictions as to limited, specified hours of the day or days of the week, not permanent prohibitions.

### III. TOWN'S ORDINANCE PROHIBITIONS ARE UNCONSTITUTIONALLY VOID FOR VAGUENESS UNDER THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OF THE U.S. CONSTITUTION

The attempted prohibitions in Section 2 of the Ordinance violate the Fourteenth Amendment's Procedural Due Process Clause and are unconstitutionally void for vagueness. To satisfy Due Process, a penal ordinance, such as the Ordinance here, "must 'define the . . . offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Reps. Comm. for Freedom of the Press v. Rokita,* 147 F.4th 720, 730 (7th Cir. 2025) (quoting *Skilling v.*

---

[7] *See e.g.,* Sections 16.05.060 and 16.05.120, Town of East Troy Code of Ordinances (*available at* https://ecode360.com/47837777) (last accessed April 26, 2026) ("traffic lane" on Lake Beulah shall be the surface of the lake that is more than 200 feet from the shore and when not in a "traffic lane" boat operating speed shall not exceed slow-no-wake).

[8] *See e.g.,* Section 46.12.D., Village of Lake Delton Code of Ordinances (*available at* https://library.municode.com/wi/lake_delton/codes/municipal_code?nodeId=PTIVNARE_CH46WATRB OWASPWAUS_46.12SPRECEWAARLADE) (last accessed April 26, 2026) (slow-no-wake speed applies during certain hours, from certain times of the year, on all of Lake Delton).

*United States*, 561 U.S. 358, 402-03, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010)).[9] "Failure to satisfy either criterion results in a[n] [ordinance] that is void for vagueness." *Rokita*, 147 F.4th at 730. Section 2 fails both prongs.

Vagueness challenges take on additional concerns when constitutional rights are impaired. *See Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed. 2d 901 (1983).[10] As one of the means of enforcing the Ordinance, a law enforcement officer effectuates a stop and seizure of the boat, impairing (or at minimum implicating) Plaintiffs' or other boaters' freedom of movement and their rights against unreasonable seizures. *See Kent v. Dulles,* 357 U.S. 116, 125, 78 S. Ct. 1113, 2 L.Ed. 2d 1204 (1958) ("right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law"); *Kolender*, 461 U.S. at 365 ("intrusiveness of even these brief stops for purposes of questioning is sufficient to render them 'seizures' under the Fourth Amendment") (Brennan, J., concurring).[11]

---

[9] The Ordinance is penal, as it both incorporates the state boating penalties found in Wis. Stat. § 30.80 and to the extent any penalties for a violation of the Ordinance are not provided for under Wis. Stat. § 30.80, it requires forfeitures of $500 for the first offense of the Ordinance and $1,000 for the second and subsequent offenses within one year. [PPFOF ¶ 122, Second Helquist Declaration, ¶ 5 at RFP 000031]. *See U.S. ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1073 (7th Cir. 1970) (municipal ordinance imposing monetary penalty of $100 is a "penal ordinance"). The Town has delegated authority in Section 1 to provide that enforcement of the Ordinance "shall" be to "all officers of the Town of Scott" and "all other individuals empowered to enforce ordinances in this Town." (hereafter "law enforcement"). [PPFOF ¶ 122, Second Helquist Declaration, ¶ 5 at RFP 000031].

[10] Impairment of other constitutionally protected interests is not required to support a facial challenge to the Ordinance. When there is vagueness in the statute or ordinance, when there are no guidelines for law enforcement, and the penal law contains no mens rea requirement, as is the case with the Ordinance, a facial challenge is proper. *See City of Chicago v. Morales*, 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed. 2d 67 (1999).

[11] The basis to stop and board a boat under the Ordinance must be based on a "reasonable cause" that a violation has occurred. Wis. Stat. § 30.79(3). To establish that "reasonable cause" to justify a stop and seizure, the law enforcement officer must first make an assessment as to whether any of the Ordinance's undefined prohibitions are violated related to "bow high manner," "artificially bow-high manner," whether an "increased" or "enhanced" wake has occurred, or whether any operation was "brief," under Sections 2(1) or 2(2) of the Ordinance. Only upon making that subjective assessment, engaging in a stop or seizure to board the boat and obtaining either consent to search or obtaining a search warrant to conduct a search, can the law enforcement officer search for the use of so-called "ballast tanks," "ballast bags," "fins," "mechanical fins" or "wake enhancing fins."

22

Further, the Ordinance's prohibitions attempt to impair Plaintiffs' constitutional rights implicated under Wisconsin law. (Discussed further, *infra*, Section IV). Namely, the Ordinance impairs Plaintiffs' rights under Wisconsin's Public Trust Doctrine in Article IX, § 1 of Wisconsin's Constitution and impairs the rights of riparian owners to reasonably recreate. *See Lake Delton*, 93 Wis. 2d at 96, 105-06 (Ct. App. 1979) (when regulating uses, to comply with the Public Trust Doctrine, "The uses must be balanced and accommodated on a case by case basis" and the ordinance must "confine[] its remedy to the precise outlines of the need addressed."); *Movrich v. Lobermeier*, 2018 WI 9, ¶ 22, 379 Wis. 2d 269, 905 N.W.2d 807 (riparian rights include "[t]he right to reasonable use of the waters for … recreational purposes") (citations and quotations omitted).

Section 2 of the Ordinance reads as follows, attempting to completely prohibit the following:

> **Section 2. Certain Artificial Wake Enhancement Prohibited**
>
> **(1)  Prohibited Equipment.** No person may use or employ ballast tanks, ballast bags or fins to cause a boat to operate in a bow-high manner, or which increases or enhances a boat's wake.
>
> **(2)  Prohibited Operation.** No person may operate a boat in an artificially bow-high manner having the effect of increasing the boat's wake. Such prohibited operation shall include wake enhancement by use of ballast tanks, or ballast bags, or mechanical fins, or continuous operation at transition speed (the speed below planing speed in which a boat is operating in plowing mode).

And therein lies one of the main problems. The so-called "ballast tanks," "ballast bags," or "fins" are items either incorporated into a boat or added to a boat which are *not visible* without boarding a boat and conducting a search of the boat or looking underneath the boat. [PPFOF at ¶¶ 33-38, 57-61]. Under the Ordinance, the law enforcement officer, before effectuating a search for the use of any so-called ballast tanks, bags, or fins, must make subjective determinations whether the boats have violated the challenged vague provisions of the ordinance. The Ordinance, without any guidelines or objective criteria to measure terms like bow high, increased, or enhanced "vests virtually complete discretion in the hands of police to determine whether the suspect has satisfied the statute and must be permitted to go on his way" with his or her boat. *Kolender*, 461 U.S. at 358.

23

(3)    **Certain Operations Excluded.** In no event shall any of the following operations be deemed a violation of this Ordinance, provided such operations do not use or employ ballast tanks, ballast bags or wake enhancing fins: i) water skiing, ii) tubing, iii) wake boarding employing a tow rope; iv) brief transition operation to empty a boat of bilge water, or v) brief transition operation of a boat accelerating into a planing condition.

[PPFOF ¶ 122, Second Helquist Declaration, ¶ 5 at RFP 000031].

"Bow-high manner," "artificially bow-high," "increases or enhances a boat's wake," "enhancement," "plowing mode," "brief transition," and "fins" or "mechanical fins" are several of the undefined, subjective terms. The Ordinance provides no guidance to law enforcement or the public. [PPFOF ¶ 166]. The Town has not done any training on how to enforce the Ordinance. [PPFOF ¶ 167]. It encourages arbitrary and discriminatory enforcement and fails to provide sufficient definiteness for the ordinary person. Section 2 is facially unconstitutional and is void for vagueness.

### A.  Ordinance encourages arbitrary and discriminatory enforcement.

As a matter of law, Section 2 fails to contain minimal guidelines for law enforcement, is standardless, and is facially unconstitutional under the Due Process Clause of the Fourteenth Amendment. The Ordinance fails to satisfy the constitutional requirement to define the offense "in a manner that does not encourage arbitration and discriminatory enforcement." *Rokita*, 147 F.4th at 730.

Among the two elements in the vagueness doctrine, "the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature *establish minimal guidelines* to govern law enforcement.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 39 L.Ed. 2d 605 (1974) (emphasis added)). Without guidelines for enforcement, when the Town Board, as

24

a legislative body, enacts the penal Ordinance and "fails to provide such minimal guidelines, a [penal] statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith*, 415 U.S. at 575). "The practical effect of the vagueness doctrine is not to make statutes readable by the laity but to limit the discretion of police and prosecutors. . . ." *Waldron v. McAtee*, 723 F.2d 1348, 1354 (7th Cir. 1983). Otherwise, like those who were only entitled to "continue to walk the public streets 'only at the whim of any police officer who happens to stop that individual [under the ordinance]," so too are the Plaintiffs here only allowed to continue using their boats on Birch Island Lake at the whim of law enforcement. *Kolender*, 461 U.S. at 358 (citations excluded).

"A statute encourages arbitrary or discriminatory enforcement 'if it impermissibly delegates to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis," giving police unfettered discretion to make 'arbitrary and erratic arrests.'" *Rokita*, 147 F.4th at 730 (quoting *Bell v. Keating*, 697 F.3d 445, 462 (7th Cir. 2012) (then quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed. 2d 222 (1972) (other citation omitted)). "A statute that is 'so standardless that it authorizes or encourages seriously discriminatory enforcement' similarly leads to concerns about fairness." *Rokita,* 147 F.4th at 728 (citing *United States v. Williams*, 553 U.S. 285, 304, 128 S.C.t 1830, 170 L.Ed. 2d 650 (2008). Accordingly, an ordinance "may be void for vagueness if it 'necessarily entrust[s] *lawmaking* to the moment-to-moment judgment of the policeman on his beat.'" *Rokita,* 147 F.4th at 730 (quoting *Kolender*, 461 U.S. at 360 (modification in original) (emphasis added). Such concern is common when an ordinance or statute has "ambiguous wording susceptible to broad interpretation by an enforcing officer." *Rokita*, 147 F.4th at 730-31. Those defects are present with this Ordinance.

Each of Section 2's standardless prohibitions provide no objective criteria or interpretive guidance to the public, law enforcement, other Town officials enforcing the Ordinance, prosecutors, or juries to determine whether the Ordinance's terms were violated.[12] The lack of objective criteria in the ordinance for law enforcement, and the lack of interpretive guidance or limiting constructions [PPFOF ¶ 166], should result in those terms being void for vagueness. *See Brown v. Kemp*, 86 F.4th 745, 774 (7th Cir. 2023) (absence of "more specific detail in the statue, as well as the lack of statutory grounds for either interpretive guidance or limiting construction means that people . . . cannot know when they are too close to a hunter, physically or visually, or are 'approaching' a hunter closely…[and] [o]n this basis alone, [those clauses] are unconstitutionally vague").[13]

Through the simple act of Plaintiffs or any other person operating their boat on the lake and producing any wake or operating in any manner which has the bow higher than any other part of the boat, law enforcement, without objective criteria or guidance, can improperly use the creation of the wake to then say it's "enhanced" or "increased" or that the boat is operated in a "bow high" manner and violative of Section 2. *See Rokita*, 147 F.4th at 731. A person may only operate their boat at the "whim" of any law enforcement officer. *Id.* (quoting *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90, 86 S.Ct. 211, 15 L.Ed. 2d 176 (1965). And in the case here, when there is a particularly disfavored group such use of vague terms with no guidance to law enforcement "furnishes a convenient tool for 'harsh and discriminatory enforcement by local

---

[12] For brevity, this Brief will continue to just reference "law enforcement" when discussing the arbitrary and discriminatory enforcement prong of vagueness, though the enforcement issues present are not just limited to law enforcement officers.

[13] These types of vague terms can also encourage vigilante, non-law enforcement citizen "enforcers" to attempt to effectuate *Terry*-style stops on boaters who may be lawfully engaged in a recreational activity that is non-violative of the Ordinance. *See Brown*, 86 F.4th at 775 (in the hunting context, "citizen's arrests – or perhaps citizen's *Terry* stops? – have been followed by actual officers stopping plaintiffs to question them, sometimes at length, about their activities" related to vague standards).

prosecuting officials, *against particular groups deemed to merit their displeasure.*'" *Kolender*, 461 U.S. at 360 (emphasis added) (citations omitted). When anti-wake boaters act as hammers, every action by a wake boater, regardless of the lack of harm or whether it violates the Ordinance, is a nail.

The Town cannot claim it lacks knowledge about the vagueness issues with its Ordinance. Before the Ordinance's enactment, two separate times, the WDNR, in its statutorily-mandated review of the Ordinance under Wis. Stat. § 30.77(3)(d), expressly warned the Town about the infirmity of its Ordinance related to subjective terms and enforceability issues. [PPFOF ¶ 104, Second Helquist Declaration, ¶ 11 at RFP 002166; ¶ 119, Second Helquist Declaration, ¶ 9 at RFP 000119]. The WDNR warned the Ordinance's terms "*are subjective and therefore, difficult to enforce.*" (emphasis added). [PPFOF ¶¶ 104, 119]. Despite the Town's apparent weight given to WDNR and trust in WDNR's input [PPFOF ¶¶ 123-125], the Town twice-failed to make revisions to address those subjective terms and enforceability issues. [PPFOF ¶ 106]. Vanous recognized there was a question regarding enforceability and "everything else was just blah, blah, blah to me." [PPFOF ¶ 154].

i. "Bow-high manner" or "artificially bow-high manner" are unconstitutionally vague

The Ordinance attempts to prohibit use of a boat in a "bow-high manner" in Section 2(1) and "artificially bow-high manner" in Section 2(2). Those terms are unconstitutionally void for vagueness. Though the "bow" of the boat is understood to be the forward or front-facing part of a boat, the Ordinance does not define "high" or "artificially . . . high", and there are no other objective standards, guidelines, or guidance for law enforcement to interpret and enforce those terms, much less to determine whether it has reasonable cause as a basis to initiate a stop and seizure of the boat. [PPFOF ¶ 166]. Vanous did not know "where the line is" on when a "bow

27

high" manner was too high. [PPFOF. ¶ 156]. Barton repeatedly could not offer a succinct definition with objective standards, attempted to rely on other documents that "will tell me what it means," with such documents not being in the Ordinance or any guidance issued by the Town. [PPFOF. ¶¶ 159-161].

The Ordinance's prohibition on "bow-high" or "artificially bow-high" operation is akin to the unconstitutionally vague prohibitions in *Brown v. Kemp*. In *Brown*, a Wisconsin statute prohibited another person from "'maintaining a visual or physical proximity'" to a hunter or "'approaching or confronting'" a hunter in order to impede the hunter. 86 F.4th at 756. Terms like "proximity" were undefined and the State attempted to defend the law by arguing proximity meant "'close enough' to impede a hunter or obstruct a hunter." *Id.* at 773. Recognizing the inherent subjectivity with that undefined term, *Brown* questioned, "What does 'close enough' mean in the context of hunting? Five feet? Fifty feet? Five hundred feet? Five hundred yards?" *Id.*

*Brown* held such language was unconstitutionally vague, both as to insufficient definiteness that ordinary people could not understand what conduct is prohibited and because it created arbitrary, discriminatory enforcement. "Absent of more specific detail in the statues, as well as the lack of statutory grounds for either interpretive guidance or a limiting construction," meant that people attempting to approach hunters "cannot know when they are too close to a hunter . . . or are approaching a hunter too closely." *Id.* at 774. Likewise, that language "left too much room for arbitrary and discriminatory enforcement" as the "lack of objective criteria . . . means that enforcement authorities, like individual citizens, cannot know when the line between lawful and unlawful conduct has been crossed." *Id.*

The vagueness issues in *Brown* apply here. Just as "proximity" and how "close" is "close enough" were unconstitutionally vague in *Brown*, so to is Section 2's prohibition regarding "bow high" and how "high" is "high enough" for there to be reasonable cause to initiate a stop and seizure of the boat? Just as there was "no objective criteria. . . to enforcement authorities to determine when someone like plaintiffs is too close" in the hunting context, here there is no objective criteria to guide law enforcement when a "bow" is "too high" or "high enough." *Brown*, 86 F.4th at 773. The Ordinance lacks the definitions or qualifiers to guide law enforcement to answer that question on an objective, measurable basis. The Town has also not issued any guidance to interpret and create objective criteria to put guardrails on a subjective standard to answer that question. [PPFOF ¶ 166].

Is the boat being operated in an impermissible "bow high" manner if Plaintiffs can see over the bow of their respective boats so as to safely see what is in front of them, as Plaintiffs currently do? [PPFOF. ¶¶ 40, 62]. That does not seem "high enough," but the Ordinance does not give guidance or objective criteria for the Plaintiffs or law enforcement. What if the bow is angled out of the water at 5 degrees? 10 degrees? 15 degrees? If it is 1 inch higher than the water's surface? One (1) foot higher than the water's surface? Two (2) feet higher than the water's surface? Town Supervisors Barton and Vanous could not define and determine how and when "bow high" was too "high" for Ordinance enforcement. [PPFOF. ¶¶ 156, 159-160]. Barton had ideas in his head from other documents, but those documents were not in the Ordinance. [PPFOF. ¶¶ 160-161].

Or is a "bow high manner" or "artificially bow high manner" like an issue of knowing when obscenity exists: where a law enforcement officer will "know it when I see it." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L.Ed. 2d 793 (1964) (Potter, J.,

29

concurring). Surely not, as that type of approach "vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the [ordinance]." *Kolender*, 461 U.S. at 358.[14]

The Ordinance does not answer those questions and is a purely visual, officer-by-officer subjective judgment that impermissibly requires law enforcement to engage in " *lawmaking* [in] the moment-to-moment judgment of the policeman on his beat.'" *Rokita,* 147 F.4th at 730 (quoting *Kolender*, 461 U.S. at 360 (modification in original). That language is "ambiguous wording susceptible to broad interpretation by an enforcing officer." *Rokita*, 147 F.4th at 730-31. (Or in the case of the Town Chairman, it should be based on some undefined standard in his head which is based on the studies he did not share with the Town Board or the public. [PPFOF ¶¶ 160-161].) It "impermissibly delegates to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis," giving police unfettered discretion to make 'arbitrary and erratic arrests.'" *Rokita*, 147 F.4th at 730 (citation omitted). Those terms are void for vagueness.

ii.   "Increases or enhances a boat's wake," "increasing the boat's wake," or "wake enhancement" are unconstitutionally vague

The same vagueness issues from *Brown* and applied to "bow-high" also arise with other core terms in Section 2(1) and 2(2) of the Ordinance. Just as "proximity" and how "close" is "close enough" were unconstitutionally vague in *Brown*, so too is Section 2's attempts to prohibit an "increased" or "enhanced" wake or "enhancement." To someone enforcing the Ordinance, how "increased enough" or "enhanced enough" does a wake need to be for it to trigger enforcement? Those terms are unconstitutionally void for vagueness.

There are no objective standards or guidance for law enforcement to determine whether it has reasonable cause as a basis to initiate a stop or seizure of the boat due to a wake being

---

[14] That "know it when I see it" defect applies to the other undefined, unguided terms in Section 2 such as "increased" or "enhanced", discussed *infra*, Sec. III.A.ii.

"increased" or "enhanced." [PPFOF ¶ 166]. Barton repeatedly could not offer a succinct definition with objective standards. [PPFOF ¶¶ 162-165]. Regarding the definition for an enhanced wake, he said, "Well, it doesn't say. Well, it does say. Does it not say in our ordinance?" [PPFOF ¶ 163]. Barton then tried to tie the wake's size to safety. [PPFOF ¶ 164]. Barton ultimately concluded, "Maybe we should have a better definition then. Maybe – I don't know." [PPFOF. ¶ 165]. Vanous thought "artificially enhanced wake" could be interpreted so broadly and with such much discretion that it could be read to prohibit any boat, even a small 10-foot fishing boat. [PPFOF ¶ 155]. As is evident from the Supervisors who enacted the ordinance, just like "proximity" and "close enough" were unconstitutionally vague, such vague language regarding a wake's size in Section 2, with no guidance or objective criteria, "leaves too much room for arbitrary and discriminatory enforcement." *Brown*, 86 F.4th at 774.

To enforce these terms, the first question that exists for law enforcement enforcing a prohibition on an "increased" or "enhanced" wake necessarily requires a comparison to a wake that is apparently not "increased" or "enhanced," but what undefined wake is that compared to? The Ordinance does not say, nor does it give guidance to a law enforcement officer. Is an "increased" or "enhanced" wake one that is compared to no wake at all? The Ordinance is silent.

Lacking any objective criteria or guidance, does a law enforcement officer compare the wake to an "ordinary" wake? If so, who and what determines what an "ordinary" wake is? If the wake is compared to an "ordinary" wake, what objective criteria does the law enforcement officer use to determine an "ordinary" wake? The Ordinance is silent and there is no guidance or objective criteria for law enforcement. To enforce a prohibition on an "increased" or "enhanced" wake, that would require the officer to set his or her own standard of a "ordinary" wake, which is entirely subjective and unconstitutional. It creates the same issues of vagueness presented

regarding the unconstitutionally vague residual clause in *Johnson v. United States*, where a judicial assessment of risk was tied to a "judicially imagined 'ordinary case' of a crime." 576 U.S. 591, 597, 135 S.Ct. 2551, 192 L.Ed. 2d 569 (2015). Here, a law enforcement officer creates an imagined "ordinary wake" and then says that a certain boat has "increased" or "enhanced" its wake compared to the "ordinary" wake.[15] Is that ordinary wake based on "documents" that Chair reviewed privately but did not share with the Board? [PPFOF ¶¶ 160-161]. An impermissible "gut instinct?" *Johnson*, 576 U.S. at 597. If this could be read so broadly to apply to a small 10-foot fishing boat [PPFOF ¶ 155], is the "ordinary wake" one coming from a canoe or kayak, a 14-foot fishing boat, an 18 foot fishing boat, a 20 foot water skiing boat, or some other undefined, undetermined criteria? Such comparisons to an "ordinary" wake would be unconstitutionally void for vagueness.

The vagueness does not stop there. At what point and where does law enforcement determine when the wake was considered to be "increased" or "enhanced"? At the point of generation from the boat? Or is a wake considered "increased" or "enhanced" at a certain point or length of it existing? At 100 feet away from when it was produced? 200 feet? 300 feet? 500 feet? When the wake first encounters another boat or person? When it first encounters a structure in the water? Does it apply even when the wake creates no harm after it encounters another boater? The Ordinance does not set this criteria, but does the enhanced wake language only apply if there is an instance of "substantial harm?" *See Keating*, 698 F.3d at 463 (tying dispersal order to "substantial harm" with imminent property damage or violence avoided vagueness). Or is the wake considered increased or enhanced at the point it laps against the shoreline from Plaintiffs

---

[15] The issues with whether a wake is "increased" or "enhanced" and how to objectively make that determination, that from boat to boat and case to case, is illustrated by the wide variety of wakes that can be created by multiple watercraft. *See* Complaint, Dkt. 2-1:21-24, ¶¶ 101-103, 105. Which of those wakes would a law enforcement officer view as impermissibly "enhanced" or "increased" and compared to what standard? The same issues with those boats apply to "bow high" as well.

who wake surf 500 to 700 feet from shore? [PPFOF ¶ 22]. The Ordinance is silent and provides no objective criteria or guidance to law enforcement to answer those questions.

Unfortunately for the Town, the vagueness does not end there. Is an increase or enhancement a measure of height? And if so, does a certain wake height make it increased or enhanced compared to the "ordinary" wake? Does a certain "width" or thickness of wave make it "increased" or "enhanced"? If such undefined, subjective, and non-objectively-stated criteria in the Ordinance are to be used, is law enforcement to use just height, just width, or both? Those terms are unconstitutionally void for vagueness.

iii. "Continuous operation" and "Plowing mode" are unconstitutionally vague

Section 2(2) attempts to prohibit "continuous operation at transition speed," with speed being defined as "the speed below planing speed in which a boat is operating in plowing mode." [PPFOF ¶ 122, Second Helquist Declaration, ¶ 5 at RFP 000031]. "Continuous" is undefined in the Ordinance. Vanous has "never heard of any limit of how long it takes you to transform from when you take off from a dead stop to 40 miles an hour or whatever." [PPFOF ¶ 157]. Vanous interprets "continuous operation" to be "operating the same" but for an unknown length of duration. [PPFOF ¶ 158]. Perhaps continuous operation does not include stop and go operations of a boat? That term is again void for vagueness.

Further, even if continuous is not unconstitutionally vague, once again there is no definition, objective criteria, or guidance for a law enforcement officer to interpret what "plowing mode" is. Is plowing mode tied to a particular bow height? A particular bow angle? Is it tied to visibility over the bow? Those terms are unconstitutionally void for vagueness.

iv.    "Brief transition operation" is unconstitutionally vague

The so-called "excluded" operations also do not provide any objective criteria or guidance to law enforcement to determine what constitutes "brief" to assess whether an operation complies with an Ordinance exemption in Section 2(3). "Brief" is the classic subjective term the Seventh Circuit has repeatedly condemned, and is akin to "proximity" *Brown* or "annoyance" or "inconvenience." *See Bell*, 697 F.3d at 463 ("serious inconvenience" is "not immune from arbitrary application"). Is "brief" measured in distance? Is it 50 feet? 100 feet? 200 feet? Is "brief" measured in a unit of time? Is it 10 seconds? 30 seconds? 1 minute? 3 minutes? This language is unconstitutionally void for vagueness.

v.    Vague provisions not severable from the remainder of Section 2.

Plaintiffs anticipate the Town will argue that in the alternative, if those terms are struck as unconstitutionally vague, that the remainder of the Ordinance can remain through the Ordinance's severability clause in Section 4. That is improper.

A severability clause is not controlling. Factors to be considered when determining if an invalid provision should be severed include the intent of the lawmaking entity and the viability of the remaining portion standing alone. *See Burlington Northern v. Superior,* 131 Wis. 2d 564, 580-581, 388 N.W.2d 916 (1986).  If the invalid part of the ordinance was created "as compensation for or an inducement to the otherwise valid portion," then it is to be presumed that all parts were intended to be passed together.  *In Int. of Hezzie R.*, 219 Wis. 2d 848, 863, 580 N.W.2d 660, 664 (1998) (internal citations omitted).  If the remaining portion cannot stand alone, the entire ordinance is void.  *Hezzie R.*, 219 Wis. 2d at 863. "[A] federal court may not completely reconstruct a local ordinance." *Am. Booksellers Ass'n, Inc.,* 771 F.2d at, 332. "[E]ven

34

the broadest severability clause does not permit a federal court to rewrite as opposed to excise.

Rewriting is work for the legislature of [the municipality.]" *Id.* at 333.

If this Court strikes the vague terms from the prohibition sections of the Ordinance, Section 2(1) and Section 2(2) will read as follows ("----" denotes word or words removed):

> (1) Prohibited Equipment.  No person may use or employ ballast tanks, ballast bags or fins to cause a boat to operate in a ----, or which ---- or ---- a boat's wake.
> (2) Prohibited Operation.  No person may operate a boat in an ---- having the effect of ---- the boat's wake.  Such prohibited operation shall include wake ---- by use of ballast tanks, or ballast bags, or mechanical fins, or ---- at transition speed (the speed below planing speed in which a boat is operating in ----).

Removal of the vague terms leaves these provisions without meaning.  Both Section 2(1) and Section 2(2) refer to "ballast tanks" and "ballast bags" and are prohibited only if they result in the boat operating in a manner which violates those vague terms. The use of this language shows that the Town's intent in prohibiting this equipment was to prevent operating in a certain manner. The invalid terms were included in the ordinance to be read together with the remaining portions. *See Hezzie R.*, 219 Wis. 2d at 863.  Because terms such as "bow high manner," "increases," and "enhances" are undefined, vague terms, the remaining language in Section 2(1) and Section 2(2) cannot stand alone. There is no need for exceptions in Section 2(3) to remain when the prohibitions are removed.

Section 3 is the Ordinance's penalty provision.  Without Section 2 defining what a violation is, there is no conduct subject to the penalty provision, rendering it unenforceable.  The parts of the Ordinance that would remain after the vague terms are removed do not stand on their own.  Thus, the Ordinance should be struck in full.

35

**B. Ordinance lacks sufficient definiteness that ordinary people can understand what conduct is prohibited**

The fatal vagueness flaws that impact the arbitrary and discriminatory enforcement also apply to the notice that ordinary people have when attempting to operate their boats. Additionally, there is no scienter requirement in Section 2's prohibitions, the presence of which can "alleviate vagueness concerns." *Rokita,* 147 F.4th at 730 (citing *Gonzales v. Carhart*, 550 U.S. 124, 149, 127 S. Ct. 1610, 167 L.Ed. 2d 480 (2007) (establishing anatomical benchmarks for abortion procedures also avoided vagueness).

Even assuming arguendo that the use of particular equipment by ordinary persons, such as ballast tanks, ballast bags, or "fins" provides some level of guidance for the ordinary person operating the boat,[16] the vague terms that follow do not provide sufficient notice for when a bow is too high, a wake is too increased or enhanced, whether an operation is brief, or whether plowing mode has been achieved. Plaintiffs are both uncertain whether a "bow high manner" means they are violating the Ordinance if they can see over the bow. [PPFOF ¶¶ 40, 62]. Both McEver and Oppenheimer are uncertain how the terms in the Ordinance related to "bow-high manner," "increase or enhances a boat's wake," "artificially bow-high manner having the effect of increasing the boat's wake," "wake enhancement," "continuous operation," or "brief transition" are defined or interpreted by the Town. [PPFOF ¶¶ 41, 63]. There is no objective criteria or guidance for Plaintiffs.

---

[16] McEver is uncertain whether the "tabs" on the boat qualify as "fins" under the Ordinance. [PPFOF ¶ 39]. If such tabs or wedges under the boat drop down during activities for exempt activities like the high-speed sports of wake boarding or water skiing, and there is a wake, does that fall within the exemption or not? It is unclear.

IV.    **ORDINANCE VIOLATES PLAINTIFFS' RIGHTS AS RIPARIAN OWNERS AND UNDER WISCONSIN'S PUBLIC TRUST DOCTRINE**

The Ordinance unlawfully infringes Plaintiffs' rights, both as riparian owners and under Wisconsin's Public Trust Doctrine and is ultra vires.

### A.  Ordinance's Prohibitions Violate Plaintiffs' Riparian Rights

The Ordinance's complete prohibitions unlawfully interfere with and remove a portion of Plaintiffs' riparian rights to reasonable recreation on Birch Island Lake. The complete prohibition conflicts with those rights under state law. An "owner of land that abuts a navigable waterway is presumed to be a riparian owner and is *entitled* to exercise *all rights afforded to a riparian owner*. . . . and the exercise of these riparian rights is subject to the requirements of [Chapter 30]." Wis. Stat. § 30.132(2) (emphasis added). "It is clear in Wisconsin that the mere fact that one owns property abutting a natural body of water presumptively confers certain rights." *Mayer v. Grueber*, 29 Wis. 2d 168, 174, 138 N.W.2d 197 (1965). Riparian owners have "'*special rights* to make use of water in a waterway adjoining an owner's property.' They are the 'bundle of rights' that may be conferred upon a property owner by virtue of his contiguity to a navigable body of water." *Movrich*, 2018 WI 9, ¶ 22 (emphasis added) (internal citations excluded). Riparian rights include "[t]he right to reasonable use of the waters for … recreational purposes." *Id*. Riparian rights are a "property right" and "[i]t carries with it the privilege to use the lake for . . . boating purposes." *Bino v. Hurley*, 273 Wis. 10, 16 (1956). Claimants' riparian rights are "substantial and valuable [] for which compensation must be given if the owner is to be deprived of [them]." *Id.* at 21.

The Ordinance's prohibitions unlawfully remove and interfere with Plaintiffs' riparian rights to "the reasonable use of the waters for … recreational purposes." *Movrich*, 2018 WI 9, ¶ 22. Barton conceded Plaintiffs' wake surfing on Birch Island Lake "didn't cause a problem."

[PPFOF ¶ 72]. Plaintiffs have received no complaints, accusations, or citations regarding their wake surfing activity on that lake, nor have there been water quality issues on Birch Island Lake during their times wake surfing on Birch Island Lake. [PPFOF ¶¶ 44-47, 65-68]. Plaintiffs stay far from the shore and have not seen any disturbance of the lake bottom when they wake surf. [PPFOF ¶¶ 22, 24-25]. Plaintiffs' recreational right of boating as riparians is reasonable and a complete prohibition on that reasonable exercise of a controversial boating activity unlawfully infringes on their riparian rights and is ultra vires.

### B.  Ordinance Violates Wisconsin Constitution's Public Trust Doctrine

Plaintiffs anticipate that Defendant will argue that even if Plaintiffs' riparian ownership rights are violated, they become subservient to Wisconsin's Public Trust Doctrine.  However,  the Public Trust Doctrine does not save the Ordinance. The Public Trust Doctrine confirms the Ordinance is an unlawful overreach and is ultra vires because the Ordinance did not confine the remedy to the precise needs addressed and did not balance interests on a case-by-case basis.[17]

The Public Trust Doctrine is enshrined in and protected by Article IX, § 1 of the Wisconsin Constitution. Wisconsin's waters "shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor." WIS. CONST. ARTICLE IX, §1. The Public Trust Doctrine "has become so thoroughly embodied in the jurisprudence of this state that this court at this late date should not now repudiate the same, *as it applies to rights of recreational enjoyment of our public waters*." *Muench v. Pub. Serv. Comm'n*, 261 Wis. 492, 515L, 55 N.W.2d 40, 45–46 (1952) (emphasis added). The Public Trust Doctrine is of such importance that the Wisconsin Supreme Court "has

---

[17] Unlike a "generalized grievance" to require the government to follow the law regarding the Public Trust Doctrine, Plaintiffs have identified how they have a "separate concrete interest" in an individualized way on Birch Island Lake. [*See e.g.* PPFOF ¶¶ 1-4, 8, 10, 28-31, 50-56] *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 731-32 (7th Cir. 2020).

long held that the public trust in navigable waters 'should be interpreted in the broad and beneficent spirit that gave rise to it in order that the people may fully enjoy the intended benefits.'" *Rock-Koshkonong Lake Dist. v. State Dept. of Natural Resources*, 2013 WI 74, ¶72, 350 Wis.2d 45, 833 N.W.2d 800. The Public Trust Doctrine provides an independent basis for Plaintiffs to ensure their rights to recreation are preserved against a municipality's overreach. *See State v. Deetz,* 66 Wis. 2d 1, 11, 224 N.W.2d 407, 412 (1974) (citizens have, and may use the Public Trust Doctrine to limit or rescind actions by government actors that infringe on the Trust).

When a municipality seeks to regulate use of Wisconsin's lakes, a broad, oversweeping, one-size-fits-all approach is improper. For the Ordinance to comply with the Public Trust Doctrine, "[t]he uses must be balanced and accommodated on a case by case basis." *Lake Delton*, 93 Wis. 2d at 96. The Ordinance must also be properly tailored, as the Ordinance must "*confine[] its remedy to the precise outlines of the need addressed*" and ensure "[i]ts effect on the rights of others [i.e., Plaintiffs] *is negligible*." *Id.* at 105-06. In contrast, an ordinance which has "a *slight* and *temporary* effect on other public interests and rights" such that "it *does not destroy* any such rights, but merely defers their exercise to other times or spaces on the lake" comports with the Public Trust Doctrine. *Id.* at 93 (emphasis added).

The Ordinance does not balance and accommodate Plaintiffs' wake surfing, nor does the Ordinance confine its remedy to the precise outlines of the need addressed. An Ordinance which seeks to completely prohibit Plaintiffs' wake surfing on a nearly 770-acre lake is not properly confined and tailored to address whatever justification the Town seeks to use. A prohibition on an otherwise legal watersport is neither balanced or negligible, especially for Plaintiffs, who purchased boats for the purpose of engaging in wake surfing. [PPFOF ¶¶ 31, 55]. The prohibition in the Ordinance lasts in perpetuity. The Ordinance's prohibition does not have a "slight and

temporary effect" on Plaintiffs' recreational rights under the Public Trust Doctrine. *Lake Delton*, 93 Wis. 2d at 93. Instead, the Ordinance's prohibition impermissibly "destroy[s] any such rights" and does not "defer[] their exercise to other times or spaces on the lake." *Id.* It's permanent and unbalanced.

Where's the proverbial beef that justifies a complete ban specifically as to Birch Island Lake? The Town's Chairperson apparently conducted "private research" or argued depth is insufficient but conceded Plaintiffs' two wake boats on Birch Island Lake have not caused a problem. [PPFOF ¶ 72]. Vanous was unaware of any issues with wake surfing on Birch Island Lake. [PPFOF ¶ 73]. The Town had no complaints regarding wake surfing on Birch Island Lake. [PPFOF ¶ 71]. Decades of wake surfing have occurred from Plaintiffs without any complaints, citations, or accusations of wrongdoing. [PPFOF ¶¶ 44-47, 65-68]. The water quality on Birch Island Lake has been and remains excellent and clear, and the Town Chairperson was unaware that Birch Island Lake's water quality was still excellent and clear. [PPFOF ¶¶ 12-18]. (Though he tried to minimize 20 years of good water quality data as a "snippet of information" or "one small piece of data." [PPFOF ¶ 19]). Plaintiffs wake surf between 500 to 700 feet from the shoreline, away from fish spawning areas in the shallows near the shorelines, and have not observed any sediment disturbance when using their boats for wake surfing. [PPFOF ¶¶ 21-22, 24-25]. Plaintiffs do not observe many boats on Birch Island Lake when wake surfing. [PPFOF ¶¶ 26-27]. The failure of the Town Board as a whole to take into account, document, or discuss the factors under Wis. Stat. § 30.77(3)(cm)1-3. further exacerbates their failure to "balance[] and accommodate[][uses] on a case by case basis." *Lake Delton*, 93 Wis. 2d at 96.

There were certainly other options for the Town besides a complete prohibition on Birch Island Lake, to "*confine[] its remedy to the precise outlines of the need addressed*" and ensure

"[i]ts effect on the rights of others [i.e., Plaintiffs] *is negligible*." *Lake Delton*, 93 Wis. 2d at 105-06 (emphasis added). The less restrictive, more precisely confined alternatives to a complete prohibition are many. Any of the following, whether on their own or in combination, had the potential to properly confine the remedy to the precise need addressed. The Town could have enacted setbacks, as they considered doing on another lake. [PPFOF ¶ 92]. Since Plaintiffs' existing uses were not causing problems on Birch Island Lake [PPFOF ¶ 72], the Town could have "grandfathered" riparian owners' existing boats on Birch Island Lake to still allow wake surfing. Had the Town Board not failed to take into account boating traffic and congestion on Birch Island Lake (as they were required to do under Wis. Stat. § 30.77(3)(cm), the Town could have limited hours or days that wake surfing occurred on Birch Island Lake to avoid so-called busy days, fishing tournaments, or times of day when fishing is more prominent, such as early morning or early evening hours. Slow-no-wake hours for the lake as a whole to ensure kayaks, canoes, and paddleboards had their own designated wake-free options were another viable option.

The Town failed to accommodate and balance Plaintiffs' recreational use on a case-by-case basis for Birch Island Lake. They jumped to the most extreme option available – a prohibition. The Town failed to confine the regulation to the precise outlines of the need addressed. And instead of a "slight and temporary" inconvenience of limiting days or hours for wake surfing or creating setbacks or zones for wake surfing to "defer[] their exercise to other times or spaces on the lake," the prohibition "destroy[ed] any such rights" in violation of the Public Trust Doctrine. *Lake Delton*, 93 Wis. 2d at 93. The Ordinance violates Plaintiffs' recreational rights under the Public Trust Doctrine and is ultra vires. Summary judgment in favor of the Plaintiffs is proper.

V.    **ORDINANCE INCONSISTENT WITH WIS. STAT. § 30.66(1) REGARDING SAFE BOATING SPEED**

The Town's Ordinance conflicts with Wisconsin's requirements for operating a boat at a safe and prudent speed. Section 30.66(1), Wis. Stat. expressly requires boat operations to occur in a reasonable and prudent speed, specifically:

> No person shall operate a motorboat at a speed greater than is reasonable and prudent under the conditions and having regard for the actual and potential hazards then existing. The speed of a motorboat shall be so controlled as to avoid colliding with any object lawfully in or on the water or with any person, boat or other conveyance in or on the water in compliance with legal requirements and exercising due care.

If Section 2 of the Ordinance survives, Section 2's apparent prohibition to operate a boat at anything less than the "speed below planning" except for a so-called "brief" time to empty a boat of bilge water or the undefined "brief transition" into planning condition, directly conflicts with Wis. Stat. § 30.66 requirement to operate the boat at a safe and prudent speed. Are Plaintiffs supposed to follow Wis. Stat. § 30.66 or the Town Ordinance? If the Ordinance is purported to be enacted for "safety" purposes, requiring boats to get up to their top speed, up to 40 miles per hours [PPFOF ¶ 157] if it is not safe or prudent to do so, is irrational and conflicts with the safe operating requirements in Wis. Stat. § 30.66(1). The Town is expressly prohibited from enacting an ordinance which is "contrary to or inconsistent with [Chapter 30]." Wis. Stat. § 30.77(3)(a); *see* Wis. Stat. § 30.77(1)(b). This prohibition in Section 2(2) is ultra vires and illegal.

## CONCLUSION

For the reasons set forth above, Plaintiffs request summary judgment in favor of Plaintiffs, invalidating the Town Ordinance.

Dated this 27th day of April, 2026.

WELD RILEY, S.C.

By:      *s/Anders B. Helquist*
        Anders B. Helquist
        WI State Bar # 1070854
        Jeffrey A. Cormell
        WI State Bar # 1101522
        John Robert Behling
        WI State Bar # 1036097

3624 Oakwood Hills Parkway
Eau Claire, WI 54701
715-839-7786
ahelquist@weldriley.com
jbehling@weldriley.com
jcormell@weldriley.com
*Counsel for Plaintiffs*